Compensation Appeals Board
No. 2009-130

APPEAL OF TIMOTHY CARNAHAN
(New Hampshire Compensation Appeals Board)

Argued: January 13, 2010
Opinion Issued: April 8, 2010

*Gawryl & MacAllister*, of Nashua (*Jared O'Connor* on the brief and orally), for the petitioner.

*Desmarais, Ewing & Johnston, PLLC*, of Manchester (*Scott Ewing* and *Heather Silverstein* on the brief, and *Mr. Ewing* orally), for the respondent.

DUGGAN, J. The petitioner, Timothy Carnahan, appeals the October 2008 decision of the New Hampshire Compensation Appeals Board (CAB) reducing his workers' compensation benefits to the diminished earning capacity rate. We affirm.

The record supports the following facts. Carnahan was a self-employed tractor-trailer driver and furniture mover until September 15, 2000, when he sustained a work-related lower back injury. Vanliner Insurance Company, the workers' compensation carrier, accepted his claim and began paying him temporary total disability benefits. Carnahan sought treatment for his injury from a variety of physicians. He ultimately had surgery in June 2001, resulting in a spinal bone fusion, but experienced persistent difficulties with pain and mobility. In December 2001, Dr. Powen Hsu, a physiatrist, began treating Carnahan for his lower back injury.

From 2002 to 2006, Carnahan received temporary total disability benefits. In 2006, after Carnahan received vocational training, the carrier petitioned the New Hampshire Department of Labor (DOL) for a reduction of his benefits due to a change in his condition. The DOL hearing officer reduced Carnahan's benefits to the diminished earning capacity rate. Carnahan appealed this decision to the CAB. While this appeal was pending, Carnahan petitioned the DOL for a new first-level hearing, arguing that he had a change in physical condition, based upon Dr. Hsu's opinion that Carnahan's spinal fusion was unstable. Carnahan sought reinstatement of his temporary total disability benefits. The DOL hearing officer denied this petition and Carnahan appealed to the CAB. The CAB consolidated both appeals into a single *de novo* hearing.

In March 2007, the CAB found that medical evidence and Carnahan's testimony supported the conclusion that he suffered from an unstable fusion, ongoing pain, and physical limitations. The CAB further found that Carnahan had a sedentary work capacity and that the carrier failed to demonstrate a change in Carnahan's condition sufficient to merit a reduction in benefits. As a result, the CAB maintained Carnahan's temporary total disability benefits.

In August 2007, the carrier again petitioned the DOL to reduce Carnahan's benefits, based upon Dr. Hsu's mistaken diagnosis of an unstable fusion. The carrier relied upon the opinion of Dr. Anthony Salerni, an orthopedic surgeon, who had determined that Carnahan's fusion was stable. In October 2007, the DOL hearing officer found that the CAB relied upon Dr. Hsu's mistaken diagnosis in the March 2007 decision and concluded that Carnahan had a full-time sedentary work capacity, but ultimately denied the carrier's request because the DOL hearing officer had not made a determination of Carnahan's earning capacity. Neither party appealed this decision.

In January 2008, the carrier petitioned the DOL for a review of the extent of continuing, work-related disability. In May 2008, the DOL hearing officer found that, based upon Carnahan's testimony and testimony from vocational witnesses, Carnahan had, "at the least, a full-time, light duty work capacity" and "a significant earning capacity." In addition, the DOL hearing officer found that Carnahan's physical capacity had improved since October 2007. As a result, the DOL hearing officer concluded that Carnahan was no longer entitled to temporary total disability benefits, and that based upon the length of disability benefits already received, this decision was effectively a termination of benefits. Carnahan appealed this decision to the CAB.

The CAB held a *de novo* hearing and in October 2008, concluded that Carnahan "was capable of at least full-time sedentary work." Based upon video surveillance evidence and vocational testimony, the CAB found Carnahan "self-limiting," uncooperative, and not credible. The CAB ruled that the carrier had demonstrated that there had been a mistake in the prior determination of the extent of Carnahan's disability and that there had been a change in his condition warranting reduced benefits. The CAB concluded that Carnahan was likely capable of returning to "gainful employment," but unlikely to return to his previous job and earning capacity. As a result, the CAB granted the carrier permission to reduce Carnahan's temporary total disability benefits to the diminished earning capacity rate, effectively terminating his benefits. Carnahan requested a rehearing, which the CAB denied in January 2009. This appeal followed.

Carnahan argues that in October 2008, the CAB was barred by res judicata and collateral estoppel from finding that his condition had changed sufficiently to reduce his benefits because both the DOL and the CAB had previously found in August 2006 and May 2008 that he had a full-time sedentary or light duty work capacity. Carnahan also contends that when the CAB determined that he had no earning capacity, but was capable of gainful employment, it erred because "gainful employment" and "earning capacity" are the same under RSA 281-A:48 (1999). Carnahan finally argues that under *Appeal of Staniels*, 142 N.H. 794, 796-97 (1998), the CAB erroneously relied upon video surveillance evidence taken after the May 2008 DOL hearing.

"We will overturn the CAB's decision only for errors of law, or if we are satisfied by a clear preponderance of the evidence before us that the decision is unjust or unreasonable." *Appeal of Dean Foods*, 158 N.H. 467, 471 (2009). The CAB's factual findings are *prima facie* lawful and reasonable. *Id.*; RSA 541:13 (2007). "[O]ur task is not to determine whether we would have found differently than did the [CAB], or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record." *Dean Foods*, 158 N.H. at 474 (quotations omitted). Carnahan bears the burden of proof. *Id.*; *Appeal of Jackson*, 142 N.H. 204, 206 (1997).

## I. Res Judicata and Collateral Estoppel

We first address Carnahan's argument that the DOL's and the CAB's determinations in August 2006 and May 2008, that Carnahan had a full-time sedentary or light duty work capacity, barred a later reduction in benefits. He argues that, without a change in his work capacity, res judicata and collateral estoppel prohibited the CAB from reducing his benefits in October 2008. We disagree.

The doctrines of res judicata and collateral estoppel apply to final agency decisions in workers' compensation cases. *Appeal of Wingate*, 149 N.H. 12, 15-16 (2002); *Appeal of Hooker*, 142 N.H. 40, 43 (1997). However, RSA 281-A:48, I, specifically states that "[a]ny party at interest with regard to an injury . . . may petition the commissioner to review a denial or an award of compensation" on several grounds, including a "change in conditions" and "mistake as to the nature or extent of the injury or disability." This plain language provides an exception to the finality otherwise accorded to CAB decisions and gives the CAB continuous jurisdiction. *See Meserve v. State*, 119 N.H. 149, 154-55 (1979) (finding that "when . . . the legislature has directed the agency to exercise continuous

jurisdiction . . . res judicata will not apply to prevent the agency from exercising its statutory power to correct a mistake of law").

■ The CAB's October 2008 decision, however, did not, as Carnahan claims, reduce his benefits without first finding a change in work capacity. In its October 2008 decision, the CAB determined that the carrier sufficiently demonstrated that there had been a mistake as to the nature and extent of Carnahan's injury and disability upon which the CAB erroneously relied in its March 2007 decision. The CAB then went on to determine that Carnahan was capable of returning to full-time gainful employment. We agree with the CAB that its error in March 2007 constitutes the type of mistake contemplated in RSA 281-A:48, I, as a proper ground for review. Because the CAB's October 2008 decision corrected this mistake, the CAB properly exercised its statutory authority to reopen and its action was not barred by either res judicata or collateral estoppel.

## II. RSA 281-A:48

We next address Carnahan's argument that because "gainful employment" and "earning capacity" have the same meaning under RSA 281-A:48, the CAB improperly reduced his benefits because it found that he "had no earning capacity, but was capable of gainful employment." In its October 2008 decision, the CAB found that the carrier "failed to meet its burden of proof that the claimant is capable of returning to his previous job and earning capacity, but . . . met its burden of proof to show that the claimant is capable of returning to full-time gainful employment." Carnahan argues that this finding is erroneous because the CAB: (1) improperly found that he had no earning capacity, but was capable of gainful employment, an inherently contradictory decision; and (2) failed to identify any change in his vocational capacity, as a change in conditions, before it determined his earning capacity. We disagree.

The interpretation of a statute is a question of law, which we review *de novo. Kenison v. Dubois*, 152 N.H. 448, 451 (2005). "[W]e first examine the language found in the statute and where possible, we ascribe the plain and ordinary meanings to words used." *Appeal of Garrison Place Real Estate Inv. Trust*, 159 N.H. 539, 542 (2009). "When a statute's language is plain and unambiguous, we need not look beyond [it] for further indications of legislative intent." *Id.* "Courts can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include." *Id.*

■ The rights and remedies provided by the workers' compensation law are "purely statutory." *McKay v. N.H. Compensation Appeals Bd.*, 143

N.H. 722, 727 (1999). "We are the final arbiter of the meaning of the workers' compensation statute, and the nature and extent of compensation to the injured employee . . . is governed by the express statutory language and that which can be fairly implied therefrom." *Appeal of Hiscoe*, 147 N.H. 223, 230 (2001) (quotation omitted).

RSA 281-A:48 provides, in pertinent part:

I. Any party at interest with regard to an injury occurring after July 1, 1965, may petition the commissioner to review a denial or an award of compensation . . . by filing a petition . . . upon the ground of a change in conditions, mistake as to the nature or extent of the injury or disability, fraud, undue influence, or coercion.

. . . .

III. If a petitioner files for reducing or for ending compensation, the petitioner shall submit along with the petition medical evidence that the injured employee is physically able to perform his or her regular work or is able to engage in gainful employment.

■ The initial test for determining whether a claimant is entitled to compensation is "whether the worker is now able to earn, in suitable work under normal employment conditions, as much as he or she earned at the time of injury." *Appeal of Woodmansee*, 150 N.H. 63, 68 (2003). The two-step analysis for reducing or terminating a claimant's benefits is: (1) "whether the claimant experienced a change in conditions"; and, if so, (2) "whether that change affected his *earning* capacity." *Jackson*, 142 N.H. at 206.

■ "Although the beginning point and usually the main concern of an inquiry into change in condition for reopening purposes is claimant's relative physical condition, . . . disability in the compensation sense has both an economic as well as a medical component." *Woodmansee*, 150 N.H. at 67 (quotation omitted); *see also* 8 L. LARSON, WORKERS' COMPENSATION LAW § 131.03[1][e] (2009). "[A] change in claimant's ability to get or hold employment, or to maintain his earlier earning level," is also considered a change in conditions, "even though claimant's physical condition may have remained unchanged." *Woodmansee*, 150 N.H. at 67. This type of change has been classified as a change in the claimant's earning capacity. *Id.* Finally, a change in conditions may also be demonstrated if "the injured employee is physically able to perform his or her regular work or is able to engage in gainful employment." *McKay*, 143 N.H. at 731 (quotation omitted).

■ We disagree that the CAB's findings in its October 2008 decision are inherently contradictory because we conclude that "gainful employment" and "earning capacity" do not have the same meaning under RSA 281-A:48. In *Woodmansee*, we defined "earning capacity" as "an objective measure of a worker's ability to earn wages" and "whether the worker is now able to earn, in suitable work under normal employment conditions, as much as he or she earned at the time of injury." *Woodmansee*, 150 N.H. at 68; *see* LARSON, *supra*. We also held that a determination of a claimant's earning capacity must reference "the worker's overall value in the marketplace, . . . taking into account such variables as his age, education and job training." *Id.* (brackets and quotation omitted).

■ However, "gainful employment" is defined in RSA 281-A:2, X-a (Supp. 2009) as "employment which reasonably conforms with the employee's age, education, training, temperament and mental and physical capacity to adapt to other forms of labor than that to which the employee was accustomed." We have treated "gainful employment" as "work capacity," or the claimant's ability to "perform some kind of work," and while it may be relevant to earning capacity, it is not dispositive. *Woodmansee*, 150 N.H. at 67-68; *Jackson*, 142 N.H. at 206. Thus, while these two definitions overlap by considering the claimant's "age, education, and job training," the terms are distinct. *Woodmansee*, 150 N.H. at 67. "Gainful employment" does not require a finding that the claimant is able to earn as much as he or she earned at the time of injury, as Carnahan asserts. Thus, the finding of gainful employment in this case is sufficient to support the CAB's decision to reduce Carnahan's benefits.

■ We also disagree that the CAB did not find a change in his vocational capacity before it determined his earning capacity. In its October 2008 decision, the CAB found Carnahan "capable of at least full-time sedentary work" and "gainful employment." The CAB also determined that his pain complaints were "likely exaggerated," and that he was "self-limiting," not credible, and uncooperative. These findings supported the CAB's ultimate finding that Carnahan experienced a change in conditions, both physically and economically, which satisfied the first prong of the analysis for modifying a claimant's benefits. *Jackson*, 142 N.H. at 206.

■ Further, Carnahan is factually incorrect when he argues that the CAB determined that he had no earning capacity. In fact, the CAB found that Carnahan no longer had his previous earning capacity, but could obtain full-time gainful employment; it therefore concluded that he had a diminished earning capacity. Because the CAB followed the proper analysis for modifying Carnahan's benefits in its October 2008 decision, as prescribed

by the plain language of RSA 281-A:48, and in accordance with case law, it acted reasonably and lawfully. *Woodmansee*, 150 N.H. at 67-68; *Jackson*, 142 N.H. at 206.

Finally, Carnahan argues that the CAB improperly applied the diminished earning capacity rate, *see* N.H. ADMIN. RULES, Lab 510.03, because it found that the carrier failed to establish that he had an earning capacity. In October 2008, the CAB did not find that Carnahan had no earning capacity, as he asserts, but determined that he did not have his previous earning capacity. Accordingly, and in light of the above discussion, this argument is without merit.

### III. Videotaped Surveillance Evidence

In May 2008, the DOL hearing officer concluded that Carnahan's physical condition had improved, and, as a result, that Carnahan had at least a full-time light duty work capacity and a significant earning capacity. The DOL hearing officer then reduced Carnahan's benefits to the diminished earning capacity rate. Carnahan appealed that decision to the CAB.

During the CAB's September 2008 hearing, the carrier introduced video surveillance evidence to demonstrate that Carnahan was capable of more physical activity than he had previously reported to his medical providers, the DOL, and the CAB. The video showed two images: (1) on the day of his May 2008 DOL hearing, Carnahan walking normally in his yard before later limping into the DOL; and (2) Carnahan setting up a backyard pool in July 2008. In its October 2008 decision, the CAB found that the video clearly demonstrates "that the claimant can do much more than he has testified that he is able to do." Furthermore, based upon the weight of all of the evidence, the CAB determined that Carnahan's pain complaints were "likely exaggerated," and that he was "self-limiting" and "capable of at least full-time sedentary work."

Relying upon *Appeal of Staniels*, 142 N.H. 794 (1998), Carnahan argues that the CAB erroneously relied upon the video evidence because it did not relate back to his condition on the date of his May 2008 hearing. We disagree.

In *Staniels*, an employer sought termination of a claimant's temporary total disability benefits on the grounds that the claimant was no longer totally disabled and failed to cooperate with vocational rehabilitation. *Id.* at 795. In 1994, a DOL hearing officer reduced the claimant's benefits and terminated his vocational rehabilitation, finding that the claimant was not totally disabled and lacked motivation to improve. *Id.* Both parties appealed this decision to the CAB. *Id.* During the CAB's 1996 *de novo* hearing, the claimant introduced evidence of his 1995 back surgery to establish his

currently disabled condition. *Id.* at 796. The CAB considered this evidence only as it related to the claimant's condition in 1994, when the DOL hearing officer first considered the matter. *Id.* The claimant appealed. *Id.*

We held that the CAB properly limited its consideration of this evidence as relevant only to the issue of the claimant's condition in 1994, when the DOL hearing officer decided the same issue. *See id.* (stating that DOL hearing officer's decision is "an adjudication as to the condition of the injured [employee] at the time it was entered and is not a judgment as to the claimant's future condition" (quotations omitted)). We further held that any change in the claimant's condition as a result of the 1995 surgery could only constitute grounds for a new petition to the DOL. *Id.* at 797.

 Here, the issue decided by the DOL hearing officer in May 2008 was Carnahan's physical capacity in May 2008. In its October 2008 decision, the CAB properly considered the video as evidence of Carnahan's physical capacity as of May 2008 and determined that the claimant had been "less than forthcoming in his testimony regarding his actual physical abilities." *See Woodmansee,* 150 N.H. at 68 (finding that "[i]t is the board's province, not ours, to weigh the evidence in the first instance" (quotation omitted)). There is nothing in the CAB's October 2008 decision that suggests that it used the video evidence to determine Carnahan's physical condition as of October 2008. On the contrary, a fair reading of this decision shows that the CAB considered the video only as evidence of Carnahan's physical condition in May 2008, as permitted under our reasoning in *Staniels,* 142 N.H. at 796-97.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and CONBOY, JJ., concurred.