NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Compensation Appeals Board
No. 2021-0153


APPEAL OF FRAN RANCOURT
(New Hampshire Compensation Appeals Board)

Argued: December 13, 2022
Opinion Issued: August 16, 2023


Law Office of Leslie H. Johnson, PLLC, of Center Sandwich (Leslie H. Johnson on the brief and orally), for the claimant.


Bernard & Merrill, PLLC, of Manchester (Kevin W. Stuart and Joseph D. Becher on the brief, and Kevin W. Stuart orally), for the carrier.


HANTZ MARCONI, J. The claimant, Fran Rancourt, appeals a decision of the Compensation Appeals Board (CAB) granting the request of the carrier, AIM Mutual — NH Employers Ins. Co., for a reduction of the claimant's benefits from the Temporary Total Disability (TTD) rate to the Diminished Earning Capacity (DEC) rate. For the reasons that follow, we affirm.

I

The record supports the following facts. The claimant began work for the Community College System of New Hampshire (CCS) in August of 2007. After working for the CCS for approximately 10 years, the claimant sustained an injury on November 20, 2017. At the time of her injury, the claimant was

employed as the "vice president of academic and community affairs."  At the same time, she was employed as an adjunct faculty member at Plymouth State University and DeVry University.

The injury occurred when the claimant slipped on ice, hitting her head. She was taken to the hospital where she received 11 staples to close a wound in her head.  She also received X-rays of her spine, which did not show any acute injuries.  The claimant received a "Full-Duty/Full-Time work release" as of November 21, 2017.  The claimant followed up with her primary care physician the next day, reporting an increase in symptoms.  She was then taken out of work for 10 days.

Three months later, on February 28, 2018, the claimant was assessed by Dr. Glassman, an independent medical examiner, who recommended "partial duty modified work part-time" and physical therapy, and that the claimant see a concussion specialist.  The claimant followed up with a concussion specialist, who recommended an MRI of the claimant's brain.  The claimant also followed up with a vision specialist.

On May 22, 2019, Glassman performed "an independent medical re-evaluation . . . regarding the injury of November 20, 2017."  Glassman reviewed the claimant's medical records and conducted a physical exam.  He reported that the claimant's diagnosis is post-concussion syndrome and that her prognosis is fair "given the fact that she is still only feeling about 35% improved."  Glassman opined that "the current disability [was] causally related to the injury date of November 20, 2017."  He concluded that the claimant did "not have the ability to return to full duty work at this time," but opined that "she could be evaluated for partial duty work, working three to four hours a day, two to three days a week."  He further concluded that the claimant "ha[d] not reached maximum medical improvement" and that she should be evaluated again in November 2019, two years post injury.

In July 2019, the claimant was visiting a friend in Maine when she fell stepping into a boat.  As a result of the fall, the claimant severely injured her left hamstring, resulting in surgery.  She reported that the fall was a result of problems with her depth perception related to her head injury.  The intake note from the hospital where she was treated immediately post injury reports that the injury was caused by the claimant "stepping into a boat when it moved away from [the] dock."  No other witness who testified at the evidentiary hearing personally witnessed the claimant's fall.

On March 2, 2020, Glassman performed another independent medical examination to evaluate the extent of the claimant's continuing disability. Glassman reported that the claimant continued to suffer from "postconcussion syndrome" as a result of the work injury in 2017.  He concluded that the claimant "has not returned to her pre-accident status" and "still has ongoing

deficits and ongoing symptoms." He reported that the claimant feels about "60% improved," and that, while "she is being seen by neuro-optometry and speech therapy," she "has reached maximum medical improvement" for her post-concussion syndrome. It was his opinion that "no further treatment is indicated for the date of injury of November 20, 2017." In addition, Glassman reported that the claimant's "left hamstring injury of July 30, 2019, is not directly or causally related to the injury date of November 20, 2017." As a result of his examination, Glassman opined that the claimant "could work full-time modified duty" and "can perform partial duty work."

In May 2020, the carrier requested a hearing, pursuant to RSA 281-A:48 (2010), seeking to reduce or terminate the TTD indemnity benefits the claimant had been receiving. The hearing officer granted the carrier's request to reduce benefits as it related to the claimant's changed condition. The claimant appealed the decision to the CAB, which held a de novo hearing.

At the hearing, the claimant, two of the claimant's friends, and the claimant's husband testified on the claimant's behalf. At the close of testimony, the CAB found that "the testimony provided by the claimant was not credible as there were many inconsistencies in her testimony," and that "[m]uch of the history [she] gave to individual treating facilities was subjective and did not appear to have any test results to support her claims of disability to the extent that she has stated." The CAB further explained that it found the independent medical examinations conducted by Glassman "persuasive." As a result, the CAB concluded that the carrier "met their burden of proof that there has been a change in the claimant['s] condition that would warrant the reduction of the indemnity benefits to the Diminished Earning Capacity rate." The claimant, thereafter, moved for reconsideration, which the CAB denied. This appeal followed.

II

The claimant first argues that the CAB erred in concluding that she had a change in work and earning capacity justifying a reduction in benefits because "the overwhelming weight of the evidence . . . supported continued temporary total disability." (Capitalization and bolding omitted.) In support of this position, the claimant makes three arguments. First, she asserts that the CAB erred in concluding that she had "work capacity" and, therefore, should not have reached the issue of whether she had "earning capacity." Second, she contends that she remains disabled as a result of her traumatic brain injury (TBI) and other symptoms, and that "there was no evidence of earning or work capacity related to her head injury." Finally, she argues that the CAB "misconstrued the IME reports of Glassman," because Glassman's final report "primarily opined on her physical limitations regarding lifting, which has nothing to do with her TBI." In sum, the claimant argues that the "medical record makes clear that [she] has been and remains temporarily and totally

disabled from the workforce." We construe these argument as a challenge to the sufficiency of the evidence on which the CAB predicated its finding that the claimant had work capacity within the meaning of the statute.

Our standard of review of CAB decisions is established by statute. Appeal of The Lawson Group, 175 N.H. 397, 399 (2022); RSA 541:13 (2021). All findings of the CAB upon all questions of fact properly before it are deemed prima facie lawful and reasonable. RSA 541:13. Accordingly, our review of the CAB's factual findings is deferential. Appeal of The Lawson Group, 175 N.H. at 399. The burden of proof rests on the appealing party to show that these findings are "clearly unreasonable or unlawful." RSA 541:13. In reviewing the CAB's factual findings, our task is not to determine whether we would have found differently than did the CAB, or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record. Appeal of Pelmac Industries, Inc., 174 N.H. 528, 535-36 (2021).

The claimant asserts that "there is no medical evidence that [she] could return to any employment" because her "multiple treating providers clearly outline her exertional and non-exertional limitations . . . concluding she is totally disabled from working" and because Glassman "failed to consider her nonexertional limitations during her third IME." In short, the claimant argues that the CAB should have credited the assessments of her treating providers rather than that of the independent medical examiner.

As the carrier points out, factfinders are free to disregard or accept, in whole or in part, conflicting expert testimony. Id. This is true particularly when the expert opinion derives at least in part from narrative from the claimant, whose credibility is thereby the subject of inquiry. Appeal of Fay, 150 N.H. 321, 325-26 (2003). Here, the CAB made an express finding that "[t]he medical information provided by the treating providers and the testimony presented by the claimant, are inconsistent, at best." Further, the CAB expressly credited the independent medical examiner, explaining that it found that "[t]he opinion of Dr. Glassman, after having performed three IME[s] [is] persuasive in this matter." Thus, it appears that the CAB credited the opinion of Glassman over any conflicting information contained in the treating providers' reports. The CAB is well within its authority as the factfinder to evaluate conflicting expert testimony and to decide to credit one expert over the other. Id.

Citing Appeal of Chickering, 141 N.H. 794, 796 (1997), the claimant argues that the CAB was obligated to give the treating providers substantially more weight than the independent medical examiner because the treating providers have more familiarity with her condition than does Glassman. We note that, here, the medical findings of the treating providers and the independent medical examiner are not all that dissimilar. Both acknowledged that the claimant continues to suffer neurological and vision deficits. They

4

disagreed, however, with respect to the limitations on the claimant's work capacity. Two of the claimant's treating providers addressed her ability to "return to work." However, only one explained her reasoning, while the other summarily stated that the claimant cannot return to work, and both impliedly measured only her ability to return to her previous position rather than her ability to perform any work. Glassman, on the other hand, specifically addressed the claimant's ability to do any work and found that she had the ability to return to "full-time light duty work." Accordingly, we conclude that the CAB did not err in crediting Glassman's reports over the reports of the treating physicians with respect to work capacity. See Appeal of Pelmac Indus., Inc., 174 N.H. at 536.

Further, after review of the record, we conclude that there was sufficient competent evidence to sustain the CAB's factual determinations. The CAB based its ruling on its conclusion that Glassman's reports were persuasive. Glassman evaluated the claimant on three occasions. During these evaluations, Glassman considered, among other things, the claimant's current treatment, activities of daily living, past medical history, and relevant medical records, and he conducted physical examinations. In Glassman's final report and subsequent addendum, he recognized the claimant's continuing deficits but opined that the claimant "had a full-time light duty work capability," clarifying that "she would [not] be able to return to work full duty, but she could work full-time modified duty." Glassman expressed that the claimant had "full-time light duty work capability of lifting 20 pounds occasionally, 10 pounds frequently, eight hours a day, five days a week" and that his opinion "specifically [pertained to] her post-concussion syndrome. . . . [N]ot for any orthopaedic issues or diagnoses." The claimant's point that Glassman's report focuses on her physical limitations rather than her nonexertional limitations is well taken. However, Glassman's report acknowledges the claimant's "postconcussion syndrome" and nonexertional deficits such as "headaches, head pressure, noise sensitivity and concentration problems," along with nausea caused by head rotation and eye movement. Thus, it is apparent that he factored these symptoms into his analysis when he opined on the claimant's physical restrictions, which, as he clarified in the later addendum, related specifically to "her concussion symptoms and post-concussion syndrome." Accordingly, we disagree that Glassman ignored the claimant's nonexertional limitations and that those limitations are not factored into his opinion of the claimant's ability to return to full-time modified duty/partial duty work. As the CAB expressly credited Glassman's opinion, we conclude that there is sufficient competent evidence in the record to sustain the CAB's factual determinations. Id. at 535-36.

The claimant also asserts that the CAB erred in concluding that her physical limitations left her with a "work capacity" sufficient to justify a reduction in her benefits. In order to justify a reduction in benefits, the carrier must show: (1) that the claimant experienced a change in condition; and (2)

5

that the changed condition affected the claimant's earning capacity.  In re Carnahan, 160 N.H. 73, 79 (2010).  A change in condition may be demonstrated if the injured employee is physically able to perform his or her regular work or is able to engage in "gainful employment."  Id. (emphasis added).  "Gainful employment," which we have treated as "work capacity," means "employment which reasonably conforms with the employee's age, education, training, temperament and mental and physical capacity to adapt to other forms of labor than that to which the employee was accustomed."  RSA 281-A:2, X-a (2015); Appeal of Carnahan, 160 N.H. at 80.  We have construed "gainful employment" or "work capacity" as the claimant's ability to "perform some kind of work."  Appeal of Carnahan, 160 N.H. at 80.  "Gainful employment" does not require a finding that the claimant is able to earn as much as he or she earned at the time of injury.  Id.

In other words, in order to find that the claimant was capable of gainful employment, or had "work capacity," the CAB was not obligated to conclude that the claimant was capable of returning to her prior work at the same income level as she enjoyed prior to injury.  Id.  Rather, to justify a reduction or termination of benefits, it needed only to determine that the claimant had a changed condition and that changed condition rendered her capable of performing "some kind of work."  Id. at 79-80.  Here, the CAB first determined that the claimant had a change in condition, crediting Glassman's report, which articulated that although the claimant did not have the capacity to return to "full duty work," she had the capacity to return to "full-time modified duty" work.  Based on this evaluation, the CAB determined that the claimant's change in condition — i.e., her ability to return to "full-time modified duty" work — "would warrant the reduction of the indemnity benefits to the Diminished Earning Capacity Rate."  As articulated above, these findings were supported by the record.  For this reason, we conclude that the CAB did not err.

The claimant next argues that the CAB "erred in requiring objective evidence, and also by failing to recognize the multiple examples of same."  This argument misconstrues the CAB's analysis.  In its narrative order, the CAB stated: "Much of the history that the claimant gave to individual treating facilities was subjective and did not appear to have any test results to support her claims of disability to the extent that she has stated."  The claimant misconstrues the decision as expressing that the CAB required an "objective test."  Rather, we understand the CAB to have articulated that, because it found that "the claimant was not credible," it also did not give credence to the subjective history of symptoms that she reported to her medical providers.  The CAB is well within its authority as factfinder to not credit treating providers' conclusions, particularly when it finds the narrative on which the providers relied is not fully credible.  Appeal of Fay, 150 N.H. at 325-26 (finding that the CAB did not err by disregarding the claimant's treating providers' opinions when their conclusions were primarily based on the unreliable narrative of the

6

claimant).  As noted above, Glassman did confirm some of the treating providers' conclusions with respect to the claimant's condition.  The CAB adopted those conclusions but rejected others that it found unsupported.  Accordingly, we find no error.

The claimant next argues that it was error for the CAB to rely on several trips she took to Millinocket, Maine to go boating as evidence that she had work or earning capacity because "it has nothing to do with her nonexertional limitations related to her head injury."  We agree that not all personal recreational activities engaged in by a claimant would belie a claim of no work or earning capacity.  However, as explained above, the CAB need only conclude that the claimant was capable of undertaking "some kind of work" rather than the same work she had performed.  Appeal of Carnahan, 160 N.H. at 80.  Thus, the CAB reasonably reviewed both the claimant's exertional and nonexertional limitations in rendering its decision.  Based on the record before us, the extended drive to Maine and the physical activity associated with boarding a boat, were properly considered by the CAB as reflective of her physical limitations and her activities of daily living, and therefore, relevant to its ultimate conclusions regarding her credibility, work capacity, and earning capacity.

Finally, the claimant asserts that the CAB erred in concluding that her hamstring injury was not causally related to the underlying head injury.  She asserts that her injury was "not unlike other related falls" and that the CAB should have credited her testimony and her treating providers on this point.  However, as noted above, the CAB did not find the claimant's testimony credible and, instead, credited Glassman's independent medical examination.  Glassman reported that he "did not feel that there was any direct causal relation between [the claimant's] left leg complaints and injury date of November 20, 2017."  The CAB also expressly found that the claimant's testimony "regarding the boating incident that caused her hamstring injury was inconsistent with the owner of the boat's testimony and therefore it is difficult to find that the boating incident was related" to her head injury.  This inconsistency is further reflected in the intake note from the hospital where the claimant was treated immediately post injury, which states that the injury was caused by the claimant "stepping into a boat when it moved away from [the] dock."  Because the CAB relied on competent evidence in the record, and is authorized to make credibility determinations when rendering findings of fact, we find no error.  Appeal of The Lawson Group, 175 N.H. at 399 ("We will not disturb the CAB's decision absent an error of law, or unless, by a clear preponderance of the evidence, we find it to be unjust or unreasonable.").

Affirmed.

MACDONALD, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.

7